## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 17 2016, 8:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jimmy Lee Bush,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 17, 2016<br><br>Court of Appeals Case No.<br>49A05-1603-CR-470<br><br>Appeal from the Marion Superior Court, Criminal Division 5<br><br>The Honorable Grant W. Hawkins, Judge<br><br>Trial Court Cause No.<br>49G05-1412-F3-55063 |

**Mathias, Judge.**

[1] Jimmy Lee Bush ("Bush") was convicted in Marion Superior Court of two counts of Level 3 felony criminal confinement. Bush appeals and argues that the State presented insufficient evidence to support his convictions.

[2] We affirm.

## Facts and Procedural History

[3] At the time relevant to this appeal, Bush was renting a home from Tanya Wagner ("Wagner"). Bush occupied the front of the home, but someone else lived in a smaller apartment in the rear of the home. Bush, as the tenant in the greater portion of the home, was responsible for the utilities. Bush believed that the other tenants were running up his utility bill, so he turned off the heat and used electric space heaters to warm his portion of the home. Bush had also modified some of the electrical outlets, apparently to allow him to use the space heaters.

[4] On the evening of December 13, 2014, Wagner and her friend Danielle Matthews ("Matthews") went to the home Bush was renting to discuss some issues regarding the property. They were unable to enter the front door because it was blocked by a table and a Christmas tree. They therefore entered the home through the back door. Wagner and Matthews conducted a walk-through inspection of the home, and Matthews noticed a shotgun hanging in a bedroom closet.

[5] After conducting the walk-through inspection, Wagner and Matthews went to the living room and began to talk about the home with Bush, including the non-

authorized changes to the electrical outlets. Also, Bush asked that the security deposit of the former tenant be transferred to him. When Wagner explained to him that she could or would not do that, Bush became incensed. At some point during the discussion, Bush said, "I got something for you bitches," then entered the bedroom. Tr. p. 34. Matthews believed that she saw a gun in Bush's pocket. After Bush entered the bedroom, Wagner heard a "ch-ch" sound, which she recognized as being a pump-action shotgun being pumped to load it with a shell. Tr. p. 31.

[6] Although neither woman explicitly asked if they could leave, they both feared that Bush might shoot them if they attempted to leave because he could see them leave from his location in the bedroom. Wagner told Bush that they could "work it out" and continued to talk with Bush in the living room. Tr. p. 34. After further discussion, Bush became angry again. This time, he told Wagner and Matthews to sit down and not go anywhere. Matthews would not comply, so Bush told her to "shut the f*ck up and sit [her] ass down." Tr. p. 84-86. At some point thereafter, another man came to the house, whom Wagner and Matthews believed to be a drug dealer. While Bush spoke with this man, Wagner and Matthews used their mobile phones to text for help.

[7] At approximately 9:00 p.m., officers from the Indianapolis Metropolitan Police Department ("IMPD") were dispatched to the scene on a report of two women being held against their will. One of the officers peered into the front window and saw Wagner and Matthews sitting next to each other. Another officer knocked on the front door and announced that he was a police officer. When

the officer knocked again, Wagner told the officer to enter through the back door. Bush then ran to the bedroom. Wagner ran out the back as one of the officers was entering through the back door and yelled that Bush had a shotgun. Matthews remained seated in the living room. Bush walked into the kitchen and met the oncoming officers, who arrested him and placed him in handcuffs.

[8] The police then conducted a quick protective sweep of the residence and saw a shotgun in the master bedroom that was accessible only from Bush's bedroom. The police then obtained a warrant to search the home. During the subsequent search, the police found a loaded Remington shotgun in the master bedroom, a loaded Winchester shotgun in Bush's bedroom closet, and a .22 caliber rifle in the kitchen. No handgun was found.

[9] On December 15, 2014, the State charged Bush with two counts of Level 3 felony criminal confinement and one count of Level 4 felony possession of a firearm by a serious violent felon. The State filed an amended information on January 21, 2015, alleging that Bush was a habitual offender. A bench trial was held on September 21, 2015. At the conclusion of the trial, the court stated:

> I agree with [defense counsel] that as you look at the spectrum of armed confinements, you go from the most aggressive down to perhaps this one. The fact remains that Ms. Matthews going to the home as an accommodation to Ms. Wagner, checking it out, making sure there were no space heaters, making sure there were no weapons. She sees nothing. Later, and this is one of those odd situations where Ms. Matthews and Ms. Wagner are there for a specific purpose, as is Mr. Bush. They are trying to work out a lease agreement. And things get loud, things get quiet, things get hot, things get cold. But some time during that continuum,

perhaps between too hot, who knows, the defendant is heard to go into the master bedroom and the familiar sound of a shotgun racking is heard. And later when the police arrive, there is a shotgun found in the master bedroom or bathroom. The shotgun had not been seen when Ms. Matthews did her walkthrough. *Is [this] a perfect case, no. Is it an adequate case to show me we have a reasonable doubt* [sic]*, Mr. Bush confined the ladies, it is*. So I'll find him guilty as charged on Counts 1 and 2.

Tr. pp. 194-95 (emphasis added). The State then dismissed the charge of possession of a firearm by a serious violent felon. Bush did not contest his previous criminal history, and the trial court then found him to be a habitual offender.

[10] At a sentencing hearing held on October 30, 2015, the trial court sentenced Bush to two concurrent terms of four years on the criminal confinement convictions and imposed a seven-year habitual offender enhancement, for an aggregate term of eleven years. Bush now appeals.

## Standard of Review

[11] Upon a challenge to the sufficiency of the evidence to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. *Toney v. State*, 961 N.E.2d 57, 58 (Ind. Ct. App. 2012) (citing *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)). We consider only the probative evidence and reasonable inferences supporting the judgment, and we will affirm if the probative evidence and reasonable inferences drawn from the evidence

could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

## Sufficiency of the Evidence

[12] We first address Bush's claim that the trial court explicitly found that there was a reasonable doubt concerning his guilt. Bush notes that the transcript indicates that the trial court stated, "Is [this] a perfect case, no. Is it an adequate case to show me *we have a reasonable doubt*, Mr. Bush confined the ladies, it is." Tr. p. 195 (emphasis added). However, immediately after this, the trial court found Bush guilty.

[13] We presume that trial courts know the applicable law. *Crider v. State*, 984 N.E.2d 618, 624 (Ind. 2013) (citing *Dumas v. State*, 803 N.E.2d 1113, 1121 (Ind. 2004)); *see also Moran v. State*, 622 N.E.2d 157, 159 (Ind. 1993) (noting the strong presumption that the trial court has acted correctly and properly followed the applicable law). Few principles of American law are more basic than the requirement that guilt be proved beyond a reasonable doubt. As noted by the United States Supreme Court:

> The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, though its crystallization into the formula beyond a reasonable doubt seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.

*In re Winship*, 397 U.S. 358, 361 (1970) (citations and internal quotations omitted). We therefore conclude that it is much more likely that the trial court judge misspoke, or that there was a transcription error, than it is that the trial court found that there was a reasonable doubt regarding Bush's guilt but still found him guilty.

[14] Bush also claims that the evidence presented by the State was insufficient to support his conviction for Level 3 felony criminal confinement. To convict Bush of Level 3 felony criminal confinement, the State had to prove that Bush, while armed with a deadly weapon, knowingly confined another person without the other person's consent. *See* Ind. Code § 35-42-3-3(a), (b)(2)(A). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). And "confine" is defined as "to substantially interfere with the liberty of a person." Ind. Code § 35-42-3-1. The statute does not require the State to prove that a deadly weapon was actually used during the confinement, only that the defendant was armed with such a weapon. *Mallard v. State*, 816 N.E.2d 53, 57 (Ind. Ct. App. 2004).

[15] Here, considering only the evidence and reasonable inferences supporting the trial court's judgment, we conclude that there is sufficient evidence to support Bush's conviction. After engaging in a heated conversation with Wagner and Matthews, Bush went into his bedroom, audibly loaded a shotgun, and told them he "had something" for them. Tr. p. 34. This caused both victims to be in fear for their lives. After Wagner attempted to calm Bush down, he again

became agitated and told Matthews to sit down and "shut the f*ck up." Tr. p. 86. Indeed, Wagner testified that Bush told them "don't go anywhere." Tr. p. 36. And although a handgun was never found, we are not at liberty to ignore Matthew's testimony that she saw the butt of a gun in Bush's pocket. It is true that Bush never directly pointed a gun at Wagner and Matthews, but he did tell the women to sit down and shut up while going into his bedroom and audibly loading a shotgun. Both women were afraid to leave for fear that Bush might shoot them. The police found two shotguns and one rifle in the home after their search.

[16] From this evidence the trier of fact could reasonably conclude that Bush, while armed with the shotgun, was aware of a high probability that his actions substantially interfered with the liberty of Wagner and Matthews against their will. *See Ransom v. State*, 850 N.E.2d 491, 498 (Ind. Ct. App. 2006) (evidence sufficient to support conviction for criminal confinement despite fact that victim never asked nor tried to leave the room, where defendant walked toward victim until she was up against a closed, likely locked, door, defendant had a gun, and victim did not feel free to leave).

[17] Accordingly, the evidence is sufficient to support Bush's convictions for criminal confinement as Level 3 felonies.

[18] Affirmed.

Robb, J., and Brown, J., concur.